### FAIRMOUNT PRESBYTERIAN CHURCH, INC., Appellant,

v.

### The PRESBYTERY OF HOLSTON OF the PRESBYTERIAN CHURCH OF the UNITED STATES of America and Thomas C. Rhea, Appellees.

Court of Appeals of Tennessee, Eastern Section.

June 3, 1975.

Certiorari Denied by Supreme Court Sept. 8, 1975.

**302**

James Lynn Price, Wendal D. Jackson, Bristol, for appellant.

J. Paul Johnson, Bristol, for appellees.

1. The Presbyterian Church in the United States is a connectional or hierarchical

OPINION

GODDARD, Judge.

This appeal involves the right to possess and use certain church property.

The Fairmount Presbyterian Church was organized in 1948 by and in the Holston Presbytery of the Presbyterian Church in the United States. In 1961 it was chartered under the laws of the State of Tennessee as the Fairmount Presbyterian Church, Inc., a corporation not for profit. The purpose clause of the Charter of the corporation reads:

> The purpose of this corporation shall be the support of public worship, the building and maintenance of churches, parsonages, schools, hospitals, chapels, and such other religious, educational, or benevolent institutions as may be necessary or proper to the work of missionary bodies in the United States, or in any foreign country, and the maintenance of all missionary undertakings, *in accord with the Standards of The Presbyterian Church in the United States.* (Emphasis supplied.)

All but one tract of land involved was originally conveyed to trustees of Fairmount Presbyterian Church and thereafter by the trustees to the corporation. The other tract was conveyed directly to the corporation. All of the deeds, both to the trustees and to the corporation, are warranty deeds with the usual covenants and warranties. None of the deeds contains any trust provisions.

During 1973 a portion of the membership of the church (the total of which constitutes the membership of the corporation, a status substantially equivalent to stockholders in a corporation for profit) became dissatisfied with some of the doctrinal positions of the General Assembly of the Presbyterian Church in the United States. On March 15, 1973, by a unanimous vote of the Session of the Fairmount Church,[1] a congregational

church, as distinguished from a congregational one. Each local congregation is gov-

meeting was called for April 1, 1973, to act on a resolution withdrawing from the Presbyterian Church in the United States. Notice to the membership was duly given and the meeting was held as scheduled. The active membership totaled 348, of which 207 were present at the congregational meeting. One hundred thirty-eight voted for the resolution, 44 voted against, and 25 abstained. Following the meeting, the minister of the church gave notice to the Presbytery of the church's (and his) intention to withdraw from the Presbyterian Church in the United States and join another Presbyterian denomination.

On May 23, 1973, the Holston Presbytery reviewed the action taken at Fairmount's congregational meeting and declared the action taken to be illegal, unconstitutional, null and void. In summary pertinent hereto the Presbytery:

A. Withdrew from Joseph C. Morecraft (the minister at Fairmount) all authority to exercise the office of Minister of the Word, and dissolved his pastoral relationship with the Fairmount Presbyterian Church and his official relationship with said congregation;

B. Declared that the action of the Session of Fairmount Presbyterian Church in calling the so-called congregational meeting on April 1, 1973, for the purpose of voting on a resolution to withdraw, was unconstitutional;

C. Held that the meeting of Fairmount Presbyterian Church congregation on April 1, 1973, was no true meeting of the congregation and that the action of Fairmount Presbyterian Church on April 1, 1973, in declaring itself to be an independent Presbyterian Church was unconstitutional and therefore null and void under the provisions of Presbyterian Law;

D. Advised the Reverend Joseph C. Morecraft, III and the Fairmount Presbyterian Church of the action taken by the Holston Presbytery.

The Fairmount Church had a right to appeal the Presbytery's decision to the Appalachian Synod, but did not do so. Instead, the Church (without a vote of authorization of the membership or directors) brought a declaratory judgment action in Chancery Court. It asked that its title to the property be quieted and that the Holston Presbytery be permanently enjoined from interfering with property owned by Fairmount Church.

The Chancellor granted a restraining order and held hearings on the merits of the case on February 11 and June 18, 1974. He issued a memorandum opinion and, for a number of reasons, found that the minority of the congregation was entitled to the use of the property which would still be part of the Presbyterian Church in the United States.

In our approach to the disposition of this case, we are keenly aware of the provisions of the First Amendment to the Constitution of the United States as well as of the equally ringing prohibitions of Section 3, Article I of our own Constitution:

Sec. 3. Freedom of worship.—That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any minister against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or mode of worship.

erned by a group of elders known as the Session. The local churches are grouped into Presbyteries (the Holston Presbytery being the one of which the Fairmount Church was a part). These are grouped into Synods (the Appalachian Synod in this case) which are presided over by the General Assembly of the church. These governing bodies all have both legislative and judicial functions.

The Supreme Court of the United States has long recognized the authority of secular courts to determine questions involving disposition of church property. A landmark case, *Watson v. Jones*, 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1872), was decided shortly after what is referred to quaintly in the opinion as "the war of the insurrection," which rent churches as well as the nation. In that case a dispute arose between a local Presbyterian Church and its Presbytery. In recognizing the court's authority to deal with the question of church property, Mr. Justice Miller, quoting with approval from a prior case, said:

> We have already cited the case of *Shannon v. Frost*, 3 B.Mon. [Ky.] 253, in which the appellate court of the state, where this controversy originated, sustains the proposition clearly and fully. "This court," says the Chief Justice, "having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church discipline. Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it."

*Watson* is heavily relied upon by the Defendants. It lays down the rule that the courts must accept the decision of the highest church authority to which a dispute has been appealed, *even* when the dispute involves church property. In the case at bar, the Holston Presbytery determined the question adversely and no appeal was made from the ruling. Therefore, the Defendants assert, this Court must accept the decision as final.

The most recent United States Supreme Court case involving this question is *Presbyterian Church In the United States et al. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church et al.*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). This case, in our view, casts doubt on the soundness of Defendants' position. In *Hull*, two Georgia Presbyterian churches attempted to withdraw from the Presbytery, which established an Administrative Commission to seek a conciliation. The sought-for conciliation did not materialize and consequently the Commission, presumably acting for the Presbytery, acknowledged withdrawal of the local leadership and proceeded to take over the local church's property on behalf of the general church. No effort was made by the local church to appeal the Commission's action. With regard to connectional churches, Georgia law implied a trust of local church property for the benefit of the general church with the further provision that upon a substantial departure by the general church from the doctrine in force at the time the local church became affiliated, the implied trust ceases to be effective and the local church may withdraw and retain its property. The issue of departure from the doctrine was submitted by the Georgia trial court to a jury, which found in favor of the local church. A writ of certiorari was granted by the Supreme Court of the United States to the Supreme Court of Georgia, which had affirmed the trial court.

The United States Supreme Court found that the Georgia court could not constitutionally concern itself with church doctrine and that a decision based on such a determination was unconstitutional.

The Court in *Hull*, while citing *Watson*, nevertheless took up the question of ownership of the church property. It reversed the case for determination of the question on "neutral principles of law" equally applicable to church and non-church litigants:

> Thus, the First Amendment severely circumscribes the rule that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amend-

ment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, *School District of Township of Abington, Pa. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

Upon remand, the Georgia Supreme Court found that because the departure from the doctrine provision was constitutionally impermissible, the entire theory of implied trust must also fail and as there were no trust provisions in the deeds conveying the property, it was owned by the majority of the local church. *Presbyterian Church In the United States et al. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 225 Ga. 259, 167 S.E.2d 658 (1969).

This Court was faced with a similar problem in *The Cumberland Presbyterian Church v. North Red Bank Cumberland Presbyterian Church*, 58 Tenn.App. 424, 430 S.W.2d 879 (1968), which was decided prior to *Hull*. The factual situation in *North Red Bank* is somewhat different from the case at bar. In that case, although the property was also conveyed without trust provisions, it was held by trustees rather than a corporation. The congregation voted unanimously to withdraw from the Cumberland Presbyterian Church with which it had been affiliated. At the direction of the Supreme Court on a prior appeal, the Constitution, Minutes of the General Assembly, and the Digest of the church were introduced in evidence in the Chancery Court. This Court found language in the Digest regarding the Presbytery holding property in trust upon the dissolution of the local congregation. Thereupon, it was found, in view of the language of the Digest, that a trust was indicated. Although the decision rested on a construction of the Digest of the church, which might be suspect under *Hull*, we believe the language used is persuasive and compelling:

> The existence of such a trust seems clearly indicated. The membership of churches can not be expected to remain constant. Old members die or leave the church and new members are constantly being added to the rolls. Persons who contributed to the purchase of the Mission property and caused it to be transferred to the Red Bank Church as a Cumberland Presbyterian Church, as well as those who have contributed to the substantial sums going into improvements later made, had every reason to expect their donations to remain under the government of the Cumberland Presbyterian Church and be used for the advancement of its faith and doctrine. The congregation as constituted at the time of withdrawal now seeks to remove the property from the control of the Cumberland Presbyterian Church and establish a free and independent church. While they may espouse the same doctrine and beliefs, it is difficult if not impossible to disassociate doctrine from government or determine where the one ends and the other begins. Nor can there be any assurance that without supervision and control by a higher church authority these doctrines and beliefs will continue to be held by the congregation.

It is our opinion the Plaintiff's charter clearly implies that the purpose of the corporation is to be a local church of the Pres-

byterian Church in the United States and, consequently, upon property being conveyed to the corporation, an implied trust arose in favor of the general church. In our view, this disposition does not offend the provisions of either the Constitution of the United States or of this State. We are attempting, and believe we have applied, "neutral principles of law" in arriving at our decision. Should a corporation, for example, be chartered for the purpose of promoting the interest of boys, in accord with the standards of the Boy Scouts of America, an implied trust would preclude the property from being diverted to the use of Boys' Clubs or Girl Scouts, or any other organization.

We prefer to rest our decision on the theory of implied trust (a "neutral principle of law") under the authority of *North Red Bank*, rather than the holding of *Watson*. We think this is appropriate because, as is noted in *Hull, Watson* is a pre-*Erie Railroad v. Tompkins* case, wherein federal courts were applying general law. We also note that when *Watson* was decided, the First Amendment freedom of religion guarantees had not been made applicable to the states by virtue of the Fourteenth Amendment. Still further, it appears to us that had *Watson* retained its full force and vigor as insisted by Defendants, it would have been dispositive of *Hull*, notwithstanding the constitutionally impermissible intrusion of the Georgia court in the area of church doctrine.

We have reviewed the persuasive authority of the sister states cited by the Defendants and note that all except one were decided prior to *Hull*. For this reason, we are content to rest our decision on the authorities herein cited.

Accordingly, the assignments of error are overruled and the Chancellor affirmed. The costs of the appeal will be taxed to the Plaintiff and the sureties on the appeal bond.

SANDERS, J., and W. I. DAVIS, Jr., Special Judge, concur.